UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

NOT FOR PUBLICATION

In re

LOCO REALTY CORP.,

Debtor.

Chapter 11

Case No. 09-11785 (AJG)

**OPINION AND ORDER REGARDING MOTION OF JPMORGAN CHASE BANK, N.A.,
AS SUCCESSOR TO WASHINGTON MUTUAL BANK, TO
(1) DISMISS OR CONVERT CHAPTER 11 CASE UNDER 11 U.S.C. § 1112(b) OR
(2) DISMISS, SUSPEND OR ABSTAIN FROM PRESIDING OVER CHAPTER 11 CASE
UNDER 11 U.S.C. § 305(a)**

Before the Court is the motion of JPMorgan Chase Bank, N.A., as successor to Washington Mutual Bank (the "Bank"), to (1) dismiss or convert the Debtor's chapter 11 case pursuant to 11 U.S.C. § 1112(b); or in the alternative, (2) dismiss, suspend or abstain from presiding over the Debtor's chapter 11 case pursuant to 11 U.S.C. § 305(a).

FACTS

The Debtor is the owner of a 45-unit mixed-use apartment building located at 1645 Grand Avenue, Bronx, NY 10453 (the "Property"). On April 3, 2009, the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. The Debtor's petition provided that the nature of the business was "single asset real estate" as defined in 11 U.S.C. § 101(51B).

On May 18, 2007, the Bank made a $3,000,000 loan to the Debtor, which was secured by the Debtor with a promissory note and mortgage on the Property. Section 2.2 of the mortgage, entitled "Absolute Assignment," purported to absolutely and presently transfer all the Debtor's interests in the leases of the Property to the Bank. In addition, the Bank had the right under section 2.2(a) to collect all rents from the leases. Under section 2.2(b), the Debtor maintained a

revocable license to collect and retain the rents but upon default, such license automatically terminated.

Around September 2008, the Debtor stopped making payments on its mortgage. Under the terms of the loan, all amounts owed by the Debtor became immediately due and payable upon default. As of January 1, 2009, the Debtor owed $3,219,075.49 in amounts past due. On January 13, 2009, the Bank initiated a foreclosure action in the Supreme Court, Bronx County. In the foreclosure action, the Bank made a motion for appointment of a receiver, which was granted by an order dated February 23, 2009. The receiver filed his oath with the state court on March 4, 2009 and filed his bond on March 9, 2009.

All proceedings in the state court foreclosure action were stayed by virtue of the Debtor's bankruptcy filing on April 3, 2009. As a result, the receiver did not take possession of the Property. On April 6, 2009, the Debtor filed a motion before the Court to use the Bank's cash collateral in the form of rents collected from tenants at the Property. On May 14, 2009, an interim order was entered permitting the Debtor to use cash collateral in the form of rents that may have been assigned to the Bank. (ECF Docket No. 39). This interim order was entered without making a determination of whether the rents were cash collateral or belonged to the Bank.[1] On May 8, 2009, the Debtor filed a plan of reorganization. (ECF Docket No. 34).

## DISCUSSION

The Bank moves to dismiss the Debtor's chapter 11 case pursuant to 11 U.S.C. § 1112(b)(1) for "cause." Section 1112(b)(1) provides

> [O]n request of a party in interest and after notice and a hearing, absent unusual circumstances specifically identified by the court that establish that the requested conversion or dismissal is not in the best interests of creditors and the estate, the court shall convert a case under this chapter to a case under chapter 7 or dismiss a case under

---

[1] A second and third interim cash collateral order was subsequently entered. (ECF Docket Nos. 44 & 48). Those orders are substantially the same as the first interim cash collateral order.

2

this chapter, whichever is in the best interests of creditors and the estate, if the movant establishes cause.

Section 1112(b)(4) lists sixteen items that constitute "cause."[2] "These examples are not exhaustive, however, and it has been established since the adoption of § 1112 that Congress used the word 'includes' purposefully and that the grounds listed in the statute are non-exclusive."[3] *In re Ameribuild Constr. Mgmt.*, 399 B.R. 129, 131 (Bankr. S.D.N.Y. 2009); *see also C-TC 9th Ave. P'ship v. Norton Co.* (*In re C-TC 9th Ave. P'ship*), 113 F.3d 1304, 1311 (2d Cir. 1997); *In re TCR of Denver, LLC*, 338 B.R. 494, 500 (Bankr. D. Colo. 2006) ("It is clear that Congress amended section 1112(b) to make it broader, more strict as to debtors, and more encompassing. For example, the legislative history for section 1112(b) reflects that versions of this section leading to the enactment are entitled 'Expanded Grounds for Dismissal or Conversion and Appointment of the Trustee.'").  Here, the Bank moves to dismiss the case for cause on the grounds of "subjective bad faith on the part of the debtor, in that the motive for filing the petition was to abuse the reorganization process, coupled with an objective element that reorganization is in fact unrealistic." *In re Gucci*, 174 B.R. 401, 409 (Bankr. S.D.N.Y. 1994).

---

[2] Section 1112(b)(4) provides

> For purposes of this subsection, the term "cause" includes-- (A) substantial or continuing loss to or diminution of the estate and the absence of a reasonable likelihood of rehabilitation; (B) gross mismanagement of the estate; (C) failure to maintain appropriate insurance that poses a risk to the estate or to the public; (D) unauthorized use of cash collateral substantially harmful to 1 or more creditors; (E) failure to comply with an order of the court; (F) unexcused failure to satisfy timely any filing or reporting requirement established by this title or by any rule applicable to a case under this chapter; (G) failure to attend the meeting of creditors convened under section 341(a) or an examination ordered under rule 2004 of the Federal Rules of Bankruptcy Procedure without good cause shown by the debtor; (H) failure timely to provide information or attend meetings reasonably requested by the United States trustee (or the bankruptcy administrator, if any); (I) failure timely to pay taxes owed after the date of the order for relief or to file tax returns due after the date of the order for relief; (J) failure to file a disclosure statement, or to file or confirm a plan, within the time fixed by this title or by order of the court; (K) failure to pay any fees or charges required under chapter 123 of title 28; (L) revocation of an order of confirmation under section 1144; (M) inability to effectuate substantial consummation of a confirmed plan; (N) material default by the debtor with respect to a confirmed plan; (O) termination of a confirmed plan by reason of the occurrence of a condition specified in the plan; and (P) failure of the debtor to pay any domestic support obligation that first becomes payable after the date of the filing of the petition.

[3] Under § 102(3), the Code's Rules of Construction provides that the term "includes" is not limiting.

The Bank bears the burden of showing cause to dismiss the case under § 1112(b).  *See In re Willows of Coventry Ltd. P'ship*, 154 B.R. 959, 960 (Bankr. N.D. Ind. 1993).

Bad faith is not a factor listed under § 1112(b)(4), nor does the Code provide a definition of either bad faith or good faith.  *See In re 68 W. 127 St., LLC*, 285 B.R. 838, 843 (Bankr. S.D.N.Y. 2002).  However, courts have uniformly held that an implicit prerequisite to filing a bankruptcy petition is "good faith on the part of the debtor, the absence of which may constitute cause for dismissal."  *See Carolin Corp. v. Miller*, 886 F.2d 693, 698 (4th Cir. 1989) (citing *In re Winshall Settlor's Tr.*, 758 F.2d 1136, 1137 (6th Cir. 1985); 2 L. King, COLLIER ON BANKRUPTCY ¶ 301.05[1], at 301-6 to 301-7 & n. 2a (15th ed. 1979)).  This "implicit" good faith requirement is required to prevent fraud or abuse of the bankruptcy process.  *See In re Shar*, 253 B.R. 621, 629 (Bankr. D.N.J. 1999) (internal citations omitted).  "Section 1112(b) and its associated 'good faith' doctrine are primarily concerned with the underlying question whether reorganization is the proper course of action in a particular debtor's case.  On that score, dismissal of a chapter 11 petition--like dismissal of any lawsuit--is not imposed principally as a sanction for bad intentions or obstreperous behavior.  Instead, dismissal flows from the legal determination the debtor is not entitled to the remedy it seeks."  *Gucci*, 174 B.R. at 410 (citing *In re Foundry of Barrington P'ship*, 129 B.R. 550, 554 (Bankr. N.D. Ill. 1991)).

   A.  <u>Bad Faith</u>

In the Second Circuit, courts look to the following factors to determine whether a debtor has acted in bad faith

> (1) the debtor has only one asset; (2) the debtor has few unsecured creditors whose claims are small in relation to those of the secured creditors; (3) the debtor's one asset is the subject of a foreclosure action as a result of arrearages or default on the debt; (4) the debtor's financial condition is, in essence, a two party dispute between the debtor and secured creditors which can be resolved in the pending state foreclosure action; (5) the timing of the debtor's filing evidences an

> intent to delay or frustrate the legitimate efforts of the debtor's secured creditors to enforce their rights; (6) the debtor has little or no cash flow; (7) the debtor can't meet current expenses including the payment of personal property and real estate taxes; and (8) the debtor has no employees.

*In re C-TC 9th Ave. P'ship*, 113 F.3d at 1311.  These factors are not to be applied mechanically and the existence of bad faith does not depend on any particular combination of factors, but rather must be gauged from the facts and circumstances of each case.  *See In re Thirtieth Place, Inc.,* 30 B.R. 503, 505 (B.A.P. 9th Cir. 1983) (citing *In re Levinsky*, 23 B.R. 210, 217 (Bankr. E.D.N.Y. 1982)).

In its reply to the motion to dismiss, the Debtor does not raise issue that most, if not all of the *C-TC* factors are satisfied in this case.[4]  Instead, the Debtor, citing *68 W. 127 St.,* 285 B.R. at 846, argues that the motion to dismiss should be denied because there is a likelihood that the Debtor could reorganize and a reasonable chance that the Debtor could emerge from bankruptcy.  To bolster its argument, the Debtor points to the plan of reorganization it filed on May 8, 2009.

In *68 W. 127 St.,* the court stated the "critical test of a debtor's bad faith remains whether on the filing date there was no reasonable likelihood that the debtor intended to reorganize and whether there is no reasonable possibility that the debtor will emerge from bankruptcy."  285 B.R. at 846 (citing *In re Sletteland*, 260 B.R. 657, 662 (Bankr. S.D.N.Y. 2001); *In re Kingston Square*, 214 B.R. 713, 725 (Bankr. S.D.N.Y. 1997)).  The Debtor submits that its filed plan is evidence of its ability to emerge from bankruptcy.  The Debtor's plan is a "new value" plan whereby creditors would be paid from (1) a $50,000 or $100,000 capital infusion from a 50%

---

[4] Indeed, the Debtor is a single asset real estate debtor with few unsecured creditors whose claims are *de minimis* when compared to the secured claim of the Bank.  Further, the Bank was prepared to file a summary judgment motion in the state court foreclosure action concerning the Property of the Debtor and a receiver was appointed before the Debtor filed its bankruptcy petition.  Moreover, the budget submitted by the Debtor in connection with its cash collateral motion does not take into account mortgage payments to the Bank or U.S. Trustee fees.  Accounting for those two sources of expenditures leaves the Debtor with little or no cash flow.  Further the Debtor does not dispute that it has no employees or that its petition was filed on the eve of the receiver taking possession of the Property.

shareholder of the Debtor;[5] (2) cash flow from operations; and (3) future income.  The secured claim of the Bank would be satisfied over a 20 year period, with a balloon payment at the end of the 20 year term.  Unsecured creditors would get five cents on the dollar and equity would retain their ownership interests in the Debtor.

"Courts should not dismiss a [c]hapter 11 case where the debtor has any significant prospect of successfully reorganizing the structure of its real debt.  *In re Johns-Manville Corp.*, 36 B.R. 727, 736 (Bankr. S.D.N.Y. 1984) (citing *Banque de Financement v. First Nat'l Bank of Boston,* 568 F.2d 911 (2d Cir. 1977)).  However, a debtor must evidence "some feasibility of effectuating a viable reorganization plan.  In this regard, it has been stated, 'debtors should not continue . . . under the umbrella of the reorganization court beyond the point at which reorganization no longer remains a realistic undertaking, unless liquidation would proceed more expeditiously and less expensively under the control of the debtor.'"  *In re McDermott*, 78 B.R. 646, 651 (Bankr. N.D.N.Y. 1985) (citing *In re L.S. Good and Co*., 8 B.R. 315, 318 (Bankr. N.D. W. Va. 1980)). "In addition, it is also clear that once rehabilitation becomes unrealistic, the debtor should not be permitted to remain under [c]hapter 11." *Id.*  The Court finds that the Debtor's proposed plan is unreasonable and not feasible on its face.

First, the Debtor states that it plans to pay creditors through the new value injection of $50,000 or $100,000, coupled with cash flow from its operations.  This statement obfuscates the fact that before the petition date the Debtor absolutely assigned its right, title and interest in all rents to the Bank.  The rents from the leases appear to be the only source of current and future cash flow to the Debtor.  Section 2.2.(a) of the mortgage entered into between the parties on May 18, 2007, provides

---

[5] Article I of the plan provides a new value infusion of $50,000, but Article VII lists the new value contribution at $100,000.

6

> Borrower hereby absolutely and unconditionally grants, transfers, conveys, sells, sets over and assigns to Lender all of Borrower's right, title and interest now existing and hereafter arising in and to the leases, subleases, concessions, licenses, franchises, occupancy agreements, tenancies, subtenancies and other agreements, either oral or written, now existing and hereafter arising which affect the Property, Borrower's interest therein or any improvements located thereon, together with any and all security deposits, guaranties of the lessees' or tenant's obligations (including any and all security therefor) and other security under such leases, subleases, concessions, licenses, franchises, occupancy agreements, tenancies, subtenancies and other agreements . . . and hereby gives to and confers upon Lender the right to collect all income, rents, issues, profits, royalties and proceeds from the Leases and any business conducted on the Property and any and all prepaid rent and security deposits thereunder . . . *This Security Instrument is intended by Lender and Borrower to create and shall be construed to create an absolute assignment to Lender of all of Borrower's right, title and interest in and to the Leases and the Rents and shall not be deemed merely to create a security interest therein for the payment of any indebtedness or the performance of any obligations under the Loan Documents . . . .*

Section 2.2(a) (emphasis added). Section 2.2(b) defined the Debtor's rights in the rents under the mortgage as a "revocable license to collect."

> Nothwithstanding the foregoing assignment of Rents, so long as no Event of Default . . . remains uncured, Borrower shall have a revocable license, to collect all Rents, and to retain the same. Upon any Event of Default, Borrower's license to collect and retain Rents shall terminate automatically and without the necessity for any notice.

Much of the parties' arguments over the cash collateral motion pending before the Court centered on whether the rents from the Property were property of the estate at the filing of the petition, so as to enable the Debtor to use such rents as cash collateral. The discussion here will center around the whether such rents are property of the estate, such that the Debtor can use them to fund its proposed plan of reorganization.

Under 11 U.S.C. § 541(a)(1), property of the estate is comprised of all legal or equitable interests of the debtor in property as of the commencement of the case. The issue here is whether the absolute assignment of rents in the mortgage divested the debtor of all legal and equitable interests in the rents as of the petition date. To determine the debtor's property rights in the rents, the Court must look to state law. *See Butner v. United States*, 440 U.S. 48, 54

(1979); *First Fidelity Bank, N.A. v. Jason Realty, L.P.* (*In re Jason Realty, L.P.*), 59 F.3d 423, 427 (3d Cir. 1995) ("Assignments of rents are interests in real property and, as such, are created and defined in accordance with the law of the situs of the real property.").

Much of the parties' dispute in the cash collateral motion centered around whether a receiver needed to be appointed and/or take possession of the Property to transfer title of the rents. New York law is, at best, unclear on the topic of whether an absolute assignment of rent transfers title to the rent upon execution of the instrument. Under New York law, a "mortgage assignment of rent clause that constitutes a pledge of rents as security in case of a default, and not an absolute assignment, creates a security interest." *In re Temple Court Assocs.*, 1996 U.S. Dist. LEXIS 13772, at *9 (S.D.N.Y. Sept. 18, 1996). If the assignment of rent clause created a security interest, a "mortgagee's interest in unpaid rents does not become enforceable until either a receiver is appointed or the mortgagee comes into possession of the property." *Id.* (citations omitted). In addition, under New York law, "an assignment of rents clause in a mortgage is not self-executing and operates merely as a pledge of the rents, to which the pledgee does not become entitled until he asserts his right by taking affirmative steps, such as the appointment of a receiver to collect the rents for the benefit of the mortgagee, or obtaining an order for the sequestration of the rents." *In re Pine Lake Vill. Apartment Co.*, 17 B.R. 829, 833 (Bankr. S.D.N.Y. 1982) (citing *Sullivan v. Rosson,* 223 N.Y. 217(1918); *In re Brose,* 254 Fed. 664 (2d Cir. 1918); *In re Hines,* 88 F2d 423 (2d Cir. 1937)).

Here, the language of section 2.2(a) of the mortgage clearly demonstrates than an absolute assignment of rents, and not a security interest, was executed. The Bank's title to the rents was not dependent on any default on the part of the Debtor. Moreover, even if the assignment could be construed as a security interest, the Bank took affirmative actions by

8

appointing the receiver on February 23, 2009, before the petition date. Therefore, whether the assignment of rents is construed as a security interest or not, the Debtor absolutely assigned its interests and title to the rents prepetition to the Bank. Moreover, under New York law, the "appointment of a receiver does not change title to the property." *In re Koula Enters*., 197 B.R. 753, 758 (Bankr. E.D.N.Y. 1996).

> A receiver pendente lite is a person appointed to take charge of the fund or property to which the receivership extends while the case remains undecided. The title to the property is not changed by the appointment. The receiver acquires no title, but only the right of possession as the officer of the court. The title remains in those in whom it was vested when the appointment was made. The object of the appointment is to secure the property pending the litigation, so that it may be appropriate in accordance with the rights of the parties, as they may be determined by the judgment in the action.

*Id.* (citing *Greenwich Sav. Bank v. Samotas*, 17 N.Y.S.2d 772, 774 (N.Y. Mun. Ct. 1940)). A receiver only effectuates a change in who has a right to possess the rents, not title. Therefore, as of the petition date, the Bank held title to the rents from the Property.

However, an absolute assignment of rents prepetition does not necessarily mean that the estate has no interest in the rents for the purposes of a § 541 analysis. *In re Grant Assoc*., 1991 U.S. Dist. LEXIS 1245, at *12 (S.D.N.Y. Feb. 5, 1991) ("The finding that the assignment was absolute does not necessarily compel the conclusion . . . that [the] Debtor retains no interest whatsoever in the rents."); *see also* Hon. John C. Minahan, Jr., *Rents and Profits in Bankruptcy: A Nebraska Primer and Consideration of L.B. 14*, 27 CREIGHTON L. REV. 158, 164 (1993) ("[T]here is serious contention in both the literature and decisional law that rents and profits are not included in property of the estate where the debtor has made an absolute assignment prior to bankruptcy."). In *In re Constable Plaza*, 125 B.R. 98, 102 (Bankr. S.D.N.Y. 1991), the court stated that even if a lender had received an absolute assignment of rents from a debtor prepetition, the debtor's interest in the property was not completely cut off. Rather the debtor

9

still had an interest in the rents in the nature of an accounting for any rents beyond the amount of the mortgage debt. *Id.* Therefore, as of the petition date, the Debtor's only interest in the rents was an accounting. *See Koula Enters.*, 197 B.R. at 759 ("[T]he debtor retains an interest in the rents because if the mortgage is ever satisfied, the right to collect rents will revest in the debtor.").

In light of the fact that the Debtor only has an interest in the rents to the extent the mortgage is ever satisfied, the cash flow from the rents itself until the mortgage is satisfied is not property of the estate and cannot be used by the Debtor to fund the plan. For that reason, the Court finds that the Debtor's proposed plan is unfeasible because there are no other apparent sources of funding outside of the rents. In *Jason Realty, L.P.,* 59 F.3d at 429, the court decided under New Jersey law, pursuant to a prepetition absolute assignment of rent agreement, that the validly assigned rents were not property of the estate. Logically, "when rents are not property of the debtor's estate, they may not be used to fund a plan of reorganization." *Id.* at 430 (citing *Commerce Bank v. Mountain View Vill.*, 5 F.3d 34, 37 (3d Cir. 1993)). Without the rents, there is no other source of funding available to the Debtor for the plan and it would be patently unfeasible.

Further, even if the rents were property of the estate, the Debtor has not shown that it would be able to propose a confirmable plan under § 1129. Under §1129(a)(7),[6] otherwise known as the "best interest of creditors" test, "absent consent, a creditor . . . must receive property that has a present value equal to that participant's hypothetical chapter 7 distribution if the debtor were liquidated instead of reorganized on the plan's effective date." 7 COLLIER ON

---

[6] (7)With respect to each impaired class of claims or interests—
    (A) each holder of a claim or interest of such class—
        (i) has accepted the plan; or
        (ii) will receive or retain under the plan on account of such claim or interest property of a value, as of the effective date of the plan, that is not less than the amount that such holder would so receive or retain if the debtor were liquidated under chapter 7 of this title on such date . . . .

BANKRUPTCY ¶ 1129.03[7][b] (15th ed. rev. 2008).  The Bank has already stated it would not consent to the plan.  Further, the Debtor has not provided an explanation of how paying the Bank over 20 years with a balloon payment at the end of the term would provide the Bank with the present value of its claim.  The Debtor has also not provided any information on how that balloon payment will be funded.  Moreover, the Debtor has been unable to obtain financing and has not produced any prospects of future financing, as the Debtor itself values the Property at $2.5 million and the Bank holds a secured debt on the Property in excess of $3 million.

Further, the Debtor assumes that there will be an accepting class under the plan.[7]  Even under that scenario, if the plan purports to "cramdown" the Bank's secured claim under § 1129(b)(2)(A)(i),[8] the Bank must retain its lien securing its claim and receive deferred cash payments equal to the value of its claim on the effective date of the plan.  The Debtor's projected cash flow does not support the deferred payments contemplated by the plan.  Further, while balloon payments are permissible, they are generally allowed when "the property itself will provide the source for the balloon payment [and t]here is no evidence that the property will decline in value. Therefore, when the balloon is due, either the property will be sold which will provide the balloon or refinancing will be possible." *Heartland Fed. Sav. & Loan Ass'n v. Briscoe Enters.* (*In re Briscoe Enters.*), 994 F.2d 1160, 1169 (5th Cir. 1993).  As mentioned above, the Bank holds an undersecured claim on the property, which calls into question the reasonableness of the balloon payments and the feasibility of the plan.

Unlike the debtor in *In re 68 W. 127 St., LLC*, the Debtor here has not earned the right to

---

[7] *See* 11 U.S.C. § 1129(a)(10).
[8] With respect to a class of secured claims, the plan provides—
    (i) (I) that the holders of such claims retain the liens securing such claims, whether the property subject to such liens is retained by the debtor or transferred to another entity, to the extent of the allowed amount of such claims; and
    (II) that each holder of a claim of such class receive on account of such claim deferred cash payments totaling at least the allowed amount of such claim, of a value, as of the effective date of the plan, of at least the value of such holder's interest in the estate's interest in such property . . . .

at least make the case for confirmation of its plan.  In *68 W. 127 St.*, the lender valued its secured claim at over $328,000.  285 B.R. at 841 n.2.  Under the terms of the plan proposed by the debtor in that case, "the [d]ebtor's principals would pay $175,000 into the estate and either guarantee a new $175,000 first mortgage loan or pay another $175,000 into the estate themselves if such loan cannot be obtained."  *Id.*  Under those terms, the *68 W. 127 St.* court held that the debtor's plan was "not mere speculation."  *Id.*  Here, the uncertainty of the Debtor's cash flow, combined with the questionable ability of the Debtor to make the indeterminate balloon payment, makes any prospect of a successful plan speculative at best.

The Court finds that the Debtor has not proposed a feasible or reasonable plan and will not likely be able to successfully emerge from bankruptcy.  As such, the Court finds there is cause to dismiss the case under § 1112(b).  Further, since the Debtor's case is dismissed, the Court will not address the Bank's motions under § 305(a).

## CONCLUSION

The Court finds that the prospects of reorganization for the Debtor are unrealistic.  A debtor who has no realistic chance of successfully emerging from bankruptcy should no longer be in chapter 11.  As such, the Debtor's chapter 11 case is dismissed.

Accordingly, it is hereby

ORDERED, the Debtor's case is dismissed.


Dated: New York, New York
      June 25, 2009

                              **s/Arthur J. Gonzalez**
                              UNITED STATES BANKRUPTCY JUDGE